# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**THERESA BLUE,**

      **Plaintiff,**

**v.**                                   **CASE NO. 8:09-CV-1258-T-EAJ**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**
_____/

## FINAL ORDER

Plaintiff brings this action pursuant to the Social Security Act (the "Act"), as amended, Title 42, United States Code, Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Act.

The undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the administrative record, and the pleadings and memoranda submitted by the parties in this case.[1]

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole and comports with applicable legal standards. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If there is substantial evidence to support the

---

[1] The parties have consented in this case to the exercise of jurisdiction by a United States Magistrate Judge (Dkt. 17).

Commissioner's findings, this court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner. See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979) (citations omitted).[2]

If the Commissioner committed an error of law, the case must be remanded for application of the correct legal standard. See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then remand to the Commissioner for clarification is required. See Jamison v. Bowen, 814 F.2d 585, 588–89 (11th Cir. 1987).

**Background**

On February 18, 2004, Plaintiff filed applications for DIB and SSI, alleging disability beginning July 7, 2003.[3] (T 12) Plaintiff's applications were denied initially and on reconsideration and an administrative hearing was held on August16, 2007. (Id.) Forty years old at the time of the hearing, Plaintiff has a general education degree and past work experience as an insurance clerk, billing and payroll clerk, daycare worker, manager of daycare, certified nurse's assistant, medical assistant, warehouse worker, and an owner of a cleaning company. (T 500, 515-16)

On September 26, 2007, an ALJ denied Plaintiff's applications. (T 13-26) The ALJ found that Plaintiff's severe impairments included chronic obstructive pulmonary disease ("COPD"), bronchitis/asthma, sleep apnea, scoliosis, cervical brachial syndrome, and depression but that these

---

[2] Decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[3] Defendant contends that Plaintiff filed her applications for DIB and SSI on February 14, 2004 (Dkt. 22 at 1). The record indicates that Plaintiff filed her applications on April 12, 2004. (T 74-77) The variance is immaterial to the issues presented in this case.

impairments, individually or in combination, did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. (T 14-16) Despite these impairments, the ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform light work with certain restrictions. (T 16-18) The ALJ held that Plaintiff had the RFC "to lift 20 pounds occasionally and ten pounds frequently, stand walk and/or sit each up to six hours in an eight hour workday with appropriate breaks, and avoid concentrated exposure to respiratory irritants. The claimant has 'mild' restriction of activities of daily living, 'mild' difficulties in maintaining social functioning, and 'mild' difficulties in maintaining concentration, persistence or pace." (T 16) The ALJ found that Plaintiff could perform her past relevant work as an insurance clerk and a billing and payroll clerk. (T 18) Accordingly, the ALJ concluded that Plaintiff was not disabled and denied Plaintiff's claims for SSI and DIB. (T 18-19)

On May 4, 2009, the Appeals Council denied review of the ALJ's decision, making it the final decision of the Commissioner in this case. (T 3-5)

## Discussion

Plaintiff argues that the Commissioner erred by: (1) failing to give proper weight to opinions of Plaintiff's treating and examining physicians, (2) dismissing Plaintiff's complaints of pain and fatigue, (3) finding that Plaintiff could perform a restricted range of light work, and (4) failing to remand the case for consideration of new evidence (Dkt. 21).

**A.** Plaintiff claims the ALJ improperly weighed the opinions of Plaintiff's treating and examining physicians (Dkt. 21 at 10-13). Specifically, Plaintiff argues that the ALJ erred in rejecting the opinion of Plaintiff's primary care physician, ignoring the opinion of a consulting physician, and failing to address the opinion of Plaintiff's treating psychiatrist.

1.      <u>Plaintiff's Treating Physicians</u>

<u>Dr. Richard F. Sweeney</u>

From 2001 to 2007, Plaintiff was treated by Richard F. Sweeney, Jr. M.D. ("Dr. Sweeney"), Plaintiff's primary care physician and a family practitioner at the Watson Clinic in Lakeland, Florida. (T 191, 453)  On February 25, 2004,  Dr. Sweeney evaluated Plaintiff for lower back pain. (T 423)  In addition to severe back pain, Plaintiff complained of wheezing, congestion, shortness of breath, migraine headaches, and GERD.  (<u>Id.</u>)  Dr. Sweeney concluded that Plaintiff "is currently disabled due to fibrositis and severe pain in the musculature and asthma."  (<u>Id.</u>)  To treat Plaintiff's asthma symptoms, Dr. Sweeney prescribed various medications, including nebulizer treatments and an inhaler.  (T 424)

On April 6, 2004, Plaintiff visited Dr. Sweeney for complaints of chest pain.  (T 414) Plaintiff also felt somewhat tired, fatigued, and depressed.  (<u>Id.</u>)  Plaintiff's EKG showed no obvious changes. (<u>Id.</u>)  Dr. Sweeney determined that Plaintiff was not in acute distress and Plaintiff's lungs were "[c]lear to auscultation and percussion." (T 415)  Plaintiff had tenderness in her arms, back, and chest, which Dr. Sweeney opined was an indication of fibrositis.  (<u>Id.</u>)  Dr. Sweeney diagnosed Plaintiff with chest pain, asthma, depression, and hypoglycemia.  (<u>Id.</u>)

On November 16, 2004, Dr. Sweeney treated Plaintiff for complaints of a runny nose.  (T 342) Dr. Sweeney concluded that Plaintiff was not in acute distress and diagnosed Plaintiff with allergic rhinitis, sinusitis, asthma exacerbation, and anxiety.  (T 343)  Dr. Sweeney recommended a pulmonary consultation.  (<u>Id.</u>)

Plaintiff visited Dr. Sweeney on January 28, 2005 for a cough.  (T 350)  Dr. Sweeney assessed Plaintiff with acute bronchitis and fatigue.  (T 351)  Plaintiff was not in acute distress and

her lungs revealed "scattered rhonchi." (Id.) Dr. Sweeney determined that Plaintiff was disabled due to asthma and fibrositis. (Id.)

In March and May 2005, Plaintiff visited Dr. Sweeney regarding left abdominal pain, sinus problems, and asthma complaints. (T 293, 355-59) On November 21, 2005, Dr. Sweeney treated Plaintiff for injuries sustained when Plaintiff fell off a ladder. (T 271) Dr. Sweeney diagnosed Plaintiff with left wrist sprain, left elbow sprain, and right elbow sprain; Dr. Sweeney prescribed an arm sling, brace, and pain medications. (Id.) In April 2006, Plaintiff saw Dr. Sweeney for sores in her mouth. (T 257) Plaintiff had a runny nose, itchy eyes, some wheezing, and intermittent shortness of breath. (Id.)

On July 1, 2007, Dr. Sweeney opined that Plaintiff was disabled due to her fibrositis, asthma, and chronic severe pain in her knees. (T 219)

In August 2007, Plaintiff saw Dr. Sweeney to refill her medications. (T 191) Upon examination, Dr. Sweeney noted that Plaintiff had no cough, no audible wheezing, no dizziness, no intolerance to cold or heat, no emotional disturbances, no joint pain or swelling, and no weakness. (T 192) Plaintiff had regular respiration and a normal gait. (Id.) Dr. Sweeney believed Plaintiff was a good candidate for a motorized scooter. (T 193) Dr. Sweeney concluded that Plaintiff was permanently and totally disabled due to tendinitis in her knees, back pain, moderate-to-severe fibrositis, and asthma. (Id.)

Dr. Eric Lipson

In April 2004, Dr. Sweeney referred Plaintiff to Eric Lipson, M.D. ("Dr. Lipson") for a pulmonary consultation. (T 418) Plaintiff's complaints included fatigue, excessive itching, severe headaches, vision difficulties, difficulty hearing, sneezing, postnasal drip, hoarseness, dysphagia,

dyspnea, coughing, wheezing, chest pain, ankle swelling, heartburn, nausea, urinary incontinence, back pain, leg cramps, arthritis, stiff and sore muscles, headaches, dizziness, numbness, and insomnia. (T 419-20) The results of Plaintiff's July 2003 spirometry were normal. (Id.) Plaintiff told Dr. Lipson that "she needs to get on disability because she just can't do anything" and that "she is disabled due to asthma and that she is really short of breath." (T 418-19)

Dr. Lipson's April 20, 2004 examination of Plaintiff revealed no areas of tenderness in her spine; Plaintiff's lungs had equal bilateral expansion with no areas of dullness to percussion. (T 420) Plaintiff's breath sounds were normal with no rales, rhonchi, or rubs. (Id.) In addition, Plaintiff's chest x-ray, quantitive alpha-1-antitrypsin level, hemogram, and liver panel were normal. (T 421) Likewise, Dr. Lipson's examination of Plaintiff's head, eyes, ears, nose, mouth, pharynx, neck, heart, abdomen, and extremities was unremarkable. (T 420) Dr. Lipson diagnosed Plaintiff with asthma. (T 421)

Dr. Eric Catz

In September 2004, Dr. Sweeney referred Plaintiff to Eric Catz, M.D. ("Dr. Catz") for a pulmonary evaluation. (T 340) Plaintiff complained of frequent episodes of wheezing, shortness of breath, congestion, and coughing. (Id.) Dr. Catz determined that Plaintiff's lungs were perfectly clear, with no wheezes, crackles, or rubs. (Id.) Plaintiff's heart rhythm was regular, her abdomen was nontender, and she had no edema. (Id.) Although Dr. Catz diagnosed Plaintiff with asthma, he noted that "[h]er symptoms are significantly out of proportion to both objective findings and the previous normal spirometry." (T 341)

Dr. G. Weyman Price

Dr. Sweeney referred Plaintiff to G. Weyman Price, M.D. ("Dr. Price") for an allergy

consultation. (T 434) On July 16, 2003, Plaintiff was congested but her lungs revealed no rales, rhonchi, or wheezing. (Id.) Dr. Price diagnosed Plaintiff with moderate persistent allergies, food sensitivities, asthma, GERD, and chronic sinusitis. (T 433) Dr. Price recommended that Plaintiff continue to take the asthma medications prescribed by Dr. Sweeney. (Id.)

In December 2004, Dr. Price diagnosed Plaintiff with moderate to severe asthma, chronic sinusitis, food sensitivity, and moderate persistent allergic rhinitis. (T 301) Dr. Price started Plaintiff on immunotherapy in March 2005. (T 359) In May 2005, Plaintiff was steroid dependent and unable to tolerate immunotherapy; however, Plaintiff tolerated Xolair treatments well. (T 295) In September 2005, Plaintiff was responding well to Xolair treatments and her peak flow remained stable. (T 278) In December 2005, Plaintiff had no complaints of allergy symptoms. (T 268) Plaintiff reported she felt much better and less congested due to the Xolair treatments. (Id.)

In March 2006, Plaintiff advised Dr. Price that the Xolair treatments were "certainly helping to better control her asthma." (T 259) When Plaintiff delayed Xolair treatments, she saw an increase in her asthma symptoms. (Id.) Plaintiff was depressed because of her financial and marriage problems as well as her inability to exercise without shortness of breath. (Id.) In addition, Plaintiff's allergies were stable and she was able to fight off an infection without any antibiotics. (Id.) Dr. Price recommended that she see a psychiatrist for a mental health survey and continue taking her medications and Xolair treatments. (Id.)

On August 22, 2006, Dr. Price treated Plaintiff for asthma-like symptoms exacerbated by heat and humidity. (T 243) Plaintiff complained of congestion, nasal discharge, and a cough. (Id.) Dr. Price noted symptoms of depression and anxiety; he diagnosed Plaintiff with significant congestion and mild tonsillitis. (Id.)

Dr. Price wrote a letter on July 11, 2007 regarding Plaintiff's disability determination. (T 218) When making determinations as to Plaintiff's level of disability, Dr. Price indicated that Plaintiff's chronic allergic and asthmatic medical conditions should be considered. (Id.) Dr. Price further noted that Plaintiff had moderate to severe persistent asthma, chronic sinobronchitis with underlying P.A.R., and steriod dependence. (Id.)

Dr. Marc Volpe

On May 20, 2006, Plaintiff fell and injured her knee. (T 253) On June 8, 2006, Marc Volpe, M.D. ("Dr. Volpe"), an orthopaedic surgeon, examined Plaintiff. (Id.) Plaintiff denied fever, dizziness, rhinorrhea, shortness of breath, chest pain, cough, nausea, headache, rash, fatigue, and insomnia or anxiety. (Id.) Plaintiff was not in acute distress, was oriented, and had an appropriate mood and effect. (T 254) Upon examination, Dr. Volpe determined that Plaintiff had a medial meniscus tear and ACL tear. (Id.) On June 27, 2006, Dr. Volpe performed an athroscopic repair on Plaintiff's left knee. (T 251) In July and August 2006, Plaintiff was "doing well" postoperatively, with good motion of her left knee. (T 246-48)

On October 5, 2006, Plaintiff was having "some pain over the lateral incision where the transfixed pin was placed. Other than that she seems to be doing excellent." (T 238) Plaintiff had a full range of motion of her knee, no signs of infection, and excellent stability. (Id.) To treat Plaintiff's tenderness consistent with bursitis, Dr. Volpe gave Plaintiff an injection of corticosteriod.

In December 2006, Dr. Volpe noted that while Plaintiff had some "giving way" resulting from the left ACL reconstruction, Plaintiff had excellent range of motion and no laxity of her left knee. (T 235)

In March 2007, Dr. Volpe treated Plaintiff for an injury to her right knee. (T 227) Plaintiff

fell on her right knee and developed a large hematoma on the anterior knee and leg. (Id.) In reference to her left knee, Dr. Volpe noted tenderness over the pes bursa; Plaintiff had good stability and no other pain with motion. (Id.)

Dr. David Puentes

Plaintiff was treated by David Puentes, D.O. ("Dr. Puentes"), a chiropractor, from March 2003 to May 2007. (T 196-216) In March 2003, Plaintiff complained of back pain, migraines, and neck pain. (T 216) Dr. Puentes diagnosed Plaintiff with cervicalgia and lumbalgia caused by Plaintiff's short left leg and irritation of Plaintiff's scoliotic curve. (Id.) In March 2003, Plaintiff responded well to spinal adjustments. (Id.)

On June 2, 2003, Plaintiff returned to Dr. Puentes with complaints of low back pain. (Id) By June 4, 2003, Plaintiff's symptoms had greatly diminished; she received a heel lift to correct her shorter left leg. (Id.)

In February 2004, Plaintiff returned to Dr. Puentes complaining of lower back pain and left lower extremity pain. (T 215) Plaintiff was using her corrective heel lift only periodically. (Id.) Plaintiff was instructed to use the heel left on a continuous basis. (Id.) Dr. Puentes treated Plaintiff for lumbar disc syndrome with left sciatica, short right leg syndrome, cervicalgia, and dorsal arthralgia. (Id.) By February 27, 2004, Plaintiff was much improved with the usage of a lumbosacral brace. (Id.)

From January 11, 2005 to June 8, 2005, Plaintiff complained about back, neck, and shoulder pain. (T 214-15) By June 10, 2005, Plaintiff's was "doing better" and her lower back pain was greatly improved. (T 214) A couple days later, Plaintiff's neck and upper back symptoms were diminished; her breathing had also improved. (Id.)

On July 6, 2005, Plaintiff was treated by Dr. Puentes for neck pain, shoulder pain, and lower back pain. (T 213) Plaintiff had aggravated her neck and lower back while riding a roller coaster. (Id.) On July 11, 2005, Plaintiff's symptoms in her neck and upper back were greatly diminished but she was experiencing some numbness in her left upper arm. (T 212) By late July 2005, Plaintiff's upper back, neck, and breathing had improved but she still had pain in her lower back (Id.) Plaintiff was not using her corrective heel lift. (Id.)

On January 24, 2006, Plaintiff advised Dr. Puentes that she fell off a ladder and injured her arms, upper back, right buttocks, and right hip. (T 211-12) Dr. Puentes diagnosed Plaintiff with cervicobrachial syndrome, lumber facet syndrome, congenital scoliosis, and congenital short left leg. (T 211) By February 13, 2006, Plaintiff was doing much better and progressing well. (T 205) On February 17, 2006, Plaintiff complained of lower back pain but the symptoms in her neck, upper back, and extremities were greatly improved. (Id.)

In August 2006, Plaintiff was treated for injuries sustained in a fall on May 20, 2006. (Id.) Plaintiff had pain in her left shoulder, left lumbar regions, left hip, and both arms (Id.) Plaintiff also complained of headaches several times a day. (Id.)

From November 2006 to February 2007, Plaintiff experienced lower and upper back pain, neck pain, and headaches. (T 201-03) By March 2007, Plaintiff's headaches, upper back pain and neck symptoms had diminished: Plaintiff was "quite well." (T 197) On May 15, 2007, Plaintiff experienced pain in her neck and upper back as well as numbness in the right arm and hand. (Id.) Later that month, Plaintiff's fingers were not as numb but she continued to complain of pain in her neck and back. (T 196)

On July 30, 2007, Dr. Puentes wrote that Plaintiff's chronic musculosketal condition,

congenital scoliosis, anatomical short leg, and osteoporosis should be considered in evaluating Plaintiff for permanent total disability. (T 195) Additionally, Dr. Puentes opined that Plaintiff's conditions were permanent and that Plaintiff's osteoporosis and congenital scoliosis were affected by Plaintiff's steroidal dependence. (Id.)

Dr. Robin N. Wooten

Beginning on April 21, 2004, Plaintiff received mental health treatments for depression from Robin N. Wooten, M.D. ("Dr. Wooten"), a psychiatrist. (T 486-89) Dr. Wooten's examination in April 2004 revealed that Plaintiff was alert, oriented, and cooperative. (T 488) Plaintiff's speech was logical, her affect was appropriate, and her cognitive functions were intact, with no impairment of recent of remote memory. (Id.) Plaintiff acknowledged increasing depression but denied suicidal thoughts. (Id.) Dr. Wooten diagnosed Plaintiff with major depression and assigned a GAF score of 55. (Id.)

In May, 2004, Plaintiff reported to Dr. Wooten that she was "feeling much better than she did at the time of the initial visit." (T 485) Plaintiff had a conflict with her daughter but was handling it appropriately. (Id.) Dr. Wooten provided minimal psychotherapy, renewed Plaintiff's prescriptions, and recommended a follow-up visit in a month. (Id.)

In June 2004, Plaintiff was dealing more dispassionately with her daughter's behavior and Plaintiff's medications were helpful. (T 484) Dr. Wooten provided minimal psychotherapy. (Id.)

In July 2004, Plaintiff's depression was treated through several therapeutic interventions. (T 481) Plaintiff spent most of her time at home and was anxious when she had an appointment. (Id.) Although Plaintiff's symptoms of depression responded to psychotherapy and medication, Plaintiff continued to experience symptoms "on occasion." (Id.) Dr. Wooten's therapy helped

Plaintiff to function at a higher level than would be possible otherwise.  (Id.)

       2.       Plaintiff's Consulting and Non-examining Physicians

Dr. H.C. Nelson

On August 2, 2004, Plaintiff was evaluated by H.C. Nelson, M.D. ("Dr. Nelson") for a disability determination.  (T 388)  Plaintiff was in visible respiratory distress, with nasal passages congested but with no rales or scattered wheezes.  (T 390)  Although there was tenderness in Plaintiff's upper thoracic region, she had a full range of motion in her spine and major joints.  (T 390-91)  Plaintiff's x-ray confirmed presence of mild thoracic scoliosis. (T 389)  Plaintiff had no paravertebral muscle spasm and only slight discomfort in her back when seated and legs raised.  (T 391) She had a normal gait and performed heel to toe walking without difficulty.  (Id.)  Plaintiff had diminished sensation in her right leg due to two knee operations but no evidence of sciatic radiculopathy. (Id.)  In reference to Plaintiff's pulmonary functions, before bronchodilation, her FVC function was 50-57% of expected normal and FEV1 from 40-47% of expected normal.  (Id.) After bronchodilation, FVC ranged from 56-63% of expected normal and FEV1 from 50-59% of expected normal.  (Id.)

Dr. Nelson diagnosed Plaintiff with the following impairments: COPD, sleep apnea, allergic rhinitis, anxiety reaction with depression, scoliosis, chronic back pain, and fibrositis/multiple joints. (Id.)  Further, Dr. Nelson did not believe Plaintiff's respiratory problems would likely improve with change in her inhaled medications.  (T 392)  Plaintiff's anxiety and depression seemed to be the result of an inability to work.  (Id.)  According to Dr. Nelson, Plaintiff had significant pulmonary impairments and some subjective discomfort in the extremities as well as scoliosis in the back.  (Id.) Dr. Nelson found that Plaintiff was able "to stand and walk for two or three hours in an eight-hour

day and sit for four to six hours in an eight-hour day with appropriate breaks. She may occasionally lift twenty-five pounds and frequently lift ten pounds." (Id.)

Dr. Ralph Dolente

On August 3, 2004, Ralph J. Dolente, Psy. D. ("Dr. Dolente"), a clinical psychologist, examined Plaintiff for a mental status evaluation. (T 400) Plaintiff was appropriately groomed and dressed; she was alert and oriented to person, place, time and situation. (T 401) Plaintiff denied any hallucinations, delusions, suicidal thoughts, and did not appear to be overtly psychotic. (T 401-02) Plaintiff's speech was clear and articulate, logical, and relevant. Plaintiff did not appear severely depressed. (T 401) And while Plaintiff seemed to be repressing some tension and anxiety, her behavior did not appear excessive or inappropriate to the circumstances. (T 402) Plaintiff's attention and concentration were fair to good, with adequate memory and no obvious severe cognitive deficits. (Id.)

Plaintiff told Dr. Dolente that she showers with a chair, drives, cooks simple meals, shops at the grocery using electric cart, folds and puts away laundry, dusts but does not clean, goes to church, goes out to dinner with her husband on occasion, uses e-mail to communicate with her son in Japan, and researches asthma on her computer. (T 401) Dr. Dolente diagnosed Plaintiff with mood disorder, reactive anxiety and depression, and parent/child relational problem. (Id.) In Dr. Dolente's opinion, Plaintiff remained functional and competent to manage her own funds. (Id.)

In April 2005, Dr. Dolente conducted a second mental status evaluation on Plaintiff. (T 326) Plaintiff was appropriately groomed and dressed, although she had gained ten pounds since August 2004. (T 327) Plaintiff was alert and oriented, with no delusions or suicidal thoughts. (T 328) Further, Plaintiff's speech was logical and relevant, with no problems with comprehension, attention

or concentration.  (Id.)  Plaintiff seemed more depressed and fatigued since her last visit.  (Id.)  As to her daily routine, Plaintiff  helped get her children ready for school, used a shower chair, and folded laundry with the help of family and friends.  (T 327)  In addition, Plaintiff frequently used the computer, dined out with her husband, occasionally drove around town, visited her parents, and prepared simple meals.  (Id.)

Dr. Dolente diagnosed Plaintiff with mood disorder and reactive anxiety and depression.  (T 328)  Although Plaintiff's asthma, anxiety, and depression were worsening, Plaintiff had good family support and a network of friends.  (Id.)  Dr. Dolente determined that Plaintiff had a good ability to communicate and remained functional.  (Id.)

### Dr. Violet Stone

On August 13, 2004, Violet Stone, M.D. ("Dr. Stone") completed a physical residual functional capacity assessment of Plaintiff.  (T 379-86) Plaintiff had a history of asthma and allergies, with episodes of acute bronchitis and wheezing in July 2003 and May 2004 but no other significant exacerbations in the 2004.  (T 380) Plaintiff also had history of scoliosis with recurrent lumbosacral pain; Plaintiff's x-rays revealed that her lumbar scoliosis was mild and otherwise her back was normal.  (Id.)

Dr. Stone limited Plaintiff to lifting and/or carrying twenty pounds occasionally, lifting and/or carrying ten pounds frequently, standing and/or walking for three hours in an eight-hour day, sitting for a total of six hours in an eight-hour day,  no limitations in pushing or pulling, and no postural limitations.  (T 380-81) Due to Plaintiff's asthma symptoms, Dr. Stone limited Plaintiff's exposure to fumes, odors, dusts, gases, and poor ventilation.  (T 383)

### Dr. Bruce F. Hertz

On August 27, 2004, Bruce F. Hertz, Ph.D. ("Dr. Hertz"), a clinical psychologist, completed a psychiatric review technique form and a mental residual functional capacity assessment.  (T 361-78)  Dr. Hertz diagnosed Plaintiff with affective disorders, specifically a mood disorder due to general medical condition and reactive anxiety.  (T 364)  Plaintiff did not appear to be in any acute distress or severely depressed. (T 373) Plaintiff arrived on time for the appointment and was alert and fully oriented.  (Id.)  Although Dr. Hertz observed some indications of tension anxiety, Plaintiff's attention and concentration were fair to good, with no obvious cognitive deficits.  (Id.)  Dr. Hertz concluded that Plaintiff had moderate limitations in her activities of daily living, mild difficulties in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, and pace.  (T 371-77)

Dr. Jim Takach

Jim Takach, M.D. ("Dr. Takach") completed a physical residual functional capacity assessment of Plaintiff on April 27, 2005.  (T 317-24)  Dr. Takach determined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, sit for about six hours in an eight-hour day, and no limitations in pushing or pulling.  (T 318) Dr. Takach found that Plaintiff could stand and/or walk about six hours in an eight-hour day and that Plaintiff had occasional postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling.  (T 318-19) In light of Plaintiff's asthma symptoms, Dr. Takach limited Plaintiff's exposure to extreme hot, extreme cold, and dusts, gases, and poor ventilation.  (T 321)

Dr. Eric Wiener

On May 14, 2005, Eric Wiener, Ph.D, ("Dr. Wiener") completed a psychiatric review technique form for Plaintiff.  (T 303-16) Dr. Wiener diagnosed Plaintiff with affective disorders

which imposed some non-severe limitations.  (T 315)  According to Dr. Wiener's assessment, Plaintiff had mild restrictions of daily living activities, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence, and pace, and no episodes of decompensation.  (T 313)

Evidence from a claimant's treating physician is entitled to considerable weight unless there is good cause to reject it.  Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir.1982).  The ALJ may discount a treating physician's opinion if it is not well-supported by medical evidence or is inconsistent with the record as a whole.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159-60 (11th Cir. 2004).  Further, the weight afforded a physician's conclusory statements regarding a claimant depends upon the extent to which the statements are supported by clinical or laboratory findings and are consistent with other evidence of record.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  The ALJ may reject an opinion that is so brief and conclusory that it lacks persuasive weight or is unsubstantiated by any clinical or laboratory findings.  Hudson v. Heckler, 755 F.2d 781, 784 (11th Cir. 1985).

The opinions of non-examining reviewing physicians standing alone do not constitute substantial evidence.  Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987).  However, it is not improper for an ALJ to consider the reports of consulting physicians -- as long as the opinion of the treating physician is accorded proper weight.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).

First, Plaintiff contends that the ALJ summarily dismissed Dr. Sweeney's opinion that Plaintiff was permanently and totally disabled.  There is no merit to this argument.

In his decision, the ALJ acknowledged Dr. Sweeney's determination that Plaintiff was

permanently and totally disabled due to asthma, chronic severe knee pain with prior anterior cruciate ligament injury, and fibrositis. (T 15)  However, the ALJ noted that a determination of disability is reserved to the Commissioner and that Dr. Sweeney's determination did not have controlling weight. (Id.)  Regarding Plaintiff's asthma, the ALJ noted that Plaintiff had a history of asthma which required treatment with a home nebulizer and prescribed medications. (T 14)  The ALJ indicated that Plaintiff's pulmonary function tests in July 2003 and April 2004 were normal. (Id.)

The ALJ properly discounted Dr. Sweeney's conclusory opinion as unsupported by the medical evidence and contradicted by Dr. Sweeney's own treatment notes.  In July 2003, Dr. Price diagnosed Plaintiff with asthma and allergies but observed that Plaintiff's lung did not reveal any rales, rhonchi, or wheezing.[4]  Because Plaintiff could not tolerate immunotherapy, Dr. Price initiated Xolair treatments in May 2005.  By March 2006, Plaintiff advised Dr. Price that the Xolair treatments were helping to control her asthma, her allergies were stable, and she was able to fight off an infection without antibiotics.  And although Dr. Price determined that Plaintiff was steroid dependent, there is no evidence that this dependence affected Plaintiff's ability to perform a restrict range of light work.

The opinions of Plaintiff's other treating physicians are consistent with Dr. Price's treatment records.  In April 2004, Dr. Lipson wrote that Plaintiff's lungs had no areas of dullness to percussion and Plaintiff's breath sounds were normal with no rales, rhonchi, or rubs.  The results of Plaintiff's July 2003 spirometry and 2004 chest x-ray were normal.  In September 2004, Dr. Catz diagnosed Plaintiff with asthma but determined that Plaintiff's lungs were perfectly clear, with no wheezes,

---

[4]  Contrary to Plaintiff's assertion, the ALJ discussed and considered the records and treatments provided by Dr. Price. (T 14-15)

crackles, or rubs. According to Dr. Catz's evaluation, Plaintiff's asthma complaints were significantly out of proportion to both objective findings and her prior tests. During a June 2006 visit with Dr. Volpe, Plaintiff denied any fever, rhinorrhea, shortness of breath, chest pain, cough, headache, fatigue, or anxiety. Furthermore, Dr. Sweeney's treatment records reflect that in August 2007, Plaintiff had no cough, no audible wheezing and her respiration was regular. Thus, the record establishes that Plaintiff's asthma could be controlled with appropriate treatment and was not disabling.

In reference to Plaintiff's chronic knee pain and fibrositis, the ALJ stated that Plaintiff injured her knee in May 2006, had surgery in June 2006, and was doing well by March 2007. (T 15) Although Plaintiff had some post-operative pain in her left knee, Plaintiff had a full range of motion in her knee, excellent stability, and was doing well following her surgery. In March 2007, Plaintiff had some tenderness in her left knee but otherwise she had no other pain. As to Plaintiff's complaints of migraines and back, hip, neck, and arm pain, Dr. Puentes's records reveal that Plaintiff's complaints of pain improved with regular spinal adjustments, the use of a corrective heel lift, and the use of a lumbosacral brace. Plaintiff's x-rays indicated her lumbar scoliosis was only mild. During 2006 and 2007, Dr. Puentes found that Plaintiff's pain symptoms had greatly improved with treatment and Plaintiff was "doing well." In August 2007, Dr. Sweeney determined that Plaintiff had no joint pain or swelling, no weakness, and a normal gait.

Second, Plaintiff asserts that the ALJ ignored Dr. Nelson's opinion that Plaintiff had a significant breathing impairment (Dkt. 21 at 11). Plaintiff makes much of the fact that the ALJ did not recount the details of Plaintiff's pulmonary function tests performed by Dr. Nelson. There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long

as the ALJ's decision enables a reviewing court to conclude that the ALJ considered the claimant's entire medical condition. Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (citation omitted). In his decision, the ALJ discussed Dr. Nelson's consultative examination in August 2004. (T 15) The ALJ noted that Dr. Nelson diagnosed Plaintiff with chronic obstructive and restrictive lung disease with chronic asthmatic bronchitis. (Id.) Consistent with Dr. Nelson's diagnosis, the ALJ found that Plaintiff had severe impairments of COPD, bronchitis, and asthma. Thus, there is no support for Plaintiff's position that the ALJ disregarded Dr. Nelson's opinion.

Finally, Plaintiff argues that the ALJ failed to consider Dr. Wooten's treatment and records (Dkt. 21 at 12-13). Plaintiff concedes that Dr. Wooten's records were not part of the administrative record before the ALJ (Dkt. 21 at 13). Plaintiff submitted these records to the Appeals Counsel after the ALJ issued his opinion. (T 6, 481-89) Consequently, the ALJ did not err in failing to discuss Dr. Wooten's opinion.

**B.** Plaintiff argues that the ALJ erred in dismissing Plaintiff's subjective complaints of fatigue and pain.

It is incumbent on the ALJ to make credibility findings as to a claimant's testimony. See generally Ryan v. Heckler, 762 F.2d 939, 942 (11th Cir. 1985). The Eleventh Circuit has established a three-part pain standard to use when evaluating a claimant's subjective complaints of pain. Holt v. Sullivan, 921 F.2d 1221,1223 (11th Cir. 1991). A plaintiff must show: (1) evidence of an underlying medical condition, and either (2) the medical evidence substantiates the severity of the pain from the condition or (3) that the condition is of sufficient severity that it would be reasonably expected to produce the pain alleged. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citations omitted).

In his opinion, the ALJ expressly cited to and applied the applicable pain standard. (T 16-17) The ALJ analyzed whether the medical evidence supported the severity of Plaintiff's allegations of pain and found that the level of pain Plaintiff claims is not consistent with the record. (Id.) Thus, the ALJ found Plaintiff's testimony generally not credible. (T 18)  Plaintiff contends that the ALJ essentially ignored Plaintiff's complaints of pain and fatigue caused by her severe respiratory problems (Dkt. 21 at 14).   There is no merit to Plaintiff's argument.

After determining that Plaintiff's COPD, bronchitis, and asthma were severe impairments, the ALJ found that the extent of Plaintiff's alleged pain symptoms were not fully credible (T 18) Plaintiff stated that she has "a lot of shortness of breath" due to asthma.  (T 501)  Plaintiff also mentioned her medications make her tired "all the time."  (Id.)  As to the pain in her knees, Plaintiff testified that she had a constant ache in her knees.  (T 503-04)  Because of scoliosis in her back and a shorter left leg, Plaintiff stated that she "always had pain in my back," and her back pain was worsening.  (T 504)  Plaintiff further alleged that she could not sit for very long because of the pain in her lower back and hips.  (T 509)

Although Plaintiff testified that she was unable to work due to pain and fatigue caused by respiratory problems, knee pain, neck pain, and back pain, the ALJ found that Plaintiff was capable of performing some exertional activity that does not require a great deal of walking.  (T 18 )  The ALJ also held that Plaintiff's medical testing supported a finding of only mild exertion.  (Id.)  At the hearing, Plaintiff testified that she could perform daily living activities, such as showering, dressing herself, light cooking, shopping, and folding laundry.  (T 506-07)  During the school year, she helped get her children ready for school and drove her daughter to school.  (T 327, 512) Additionally, Plaintiff watched television and used the computer to email her son in the Navy and

to do research for her children's homework.  (T 327, 514)   Plaintiff also attended church once a week, took short drives around town, visited her parents, and occasionally dined out with her husband. (T 327, 401)  Plaintiff's testimony regarding her daily living activities is consistent with the statements she made to Dr. Dolente in 2004 and 2005.  (T 327, 401)

Moreover, the record demonstrates that her asthma and allergy problems could be controlled with appropriate treatment.   Plaintiff's consistent use of prescribed medications and Xolair treatments helped control her asthma, stabilized her allergies, and enabled her to fight off respiratory infections without the use of antibiotics.  The record indicates that when Plaintiff delayed her Xolair treatments, she experienced an increase in respiratory problems.  Regarding Plaintiff's knee pain, Dr. Volpes determined that Plaintiff had a full range of motion in her left knee, excellent stability, and only minor tenderness.  As to Plaintiff's complaints of migraines and back, hip, neck, and arm pain, Dr. Puentes's records reveal that Plaintiff's complaints of pain improved with regular spinal adjustments, the use of a corrective heel lift, and the use of a lumbosacral brace.  When Plaintiff failed to use her corrective heel lift or rode roller coasters, she experienced increased back pain. Further, Plaintiff's x-rays indicated that her lumbar scoliosis was only mild.  During 2006 and 2007, Dr. Puentes's notes reveal that Plaintiff's pain symptoms had greatly improved with treatment and Plaintiff was "doing well." Likewise, Dr. Sweeney noted in August 2007, that Plaintiff had no joint pain or swelling, no weakness, and a normal gait.

As the ALJ properly considered Plaintiff's pain testimony, substantial evidence supports the ALJ's credibility determination.  Accordingly, remand on this issue is not warranted.

**C.**     Plaintiff contends that the ALJ erred by finding that Plaintiff could perform a restricted range of light work.  Specifically, the Plaintiff alleges the ALJ improperly relied on the opinions of two

consulting physicians in determining Plaintiff's RFC.

The RFC assessment is a function-by-function assessment, based on all of the relevant evidence, of an individual's ability to do work-related activities despite any impairments. See Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess ... her work-related abilities on a function by function basis.... Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very heavy." Freeman v. Barnhart, 220 F. App'x 957, 959 (11th Cir. 2007) (per curiam) (unpublished) (quoting S.S.R. 96-8p).

First, Plaintiff contends that, because Dr. Stone's RFC assessment limited Plaintiff to sedentary work, the ALJ erred in finding that Plaintiff could perform a restricted range of light work. Contrary to Plaintiff's assertion, Dr. Stone did not limit Plaintiff to performing a restricted range of sedentary work. Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). A sedentary job is defined as one which involves sitting; a certain amount of walking and standing is often necessary to carry out job duties. Id. Jobs are considered sedentary if walking and standing are required occasionally. Id. On the other hand, light work involves lifting no more than twenty pounds, with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. § 404.1567(b). A claimant is capable of doing light work if the job requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls." Id. To be considered capable of performing a full range of light work, the claimant must have the ability to do substantially all these activities. Id.

Dr. Stone limited Plaintiff to standing and/or walking for three hours in an eight-hour day,

and sitting for a total of six hours in an eight-hour day. (T 380) In addition, Dr. Stone limited Plaintiff to lifting and/or carrying twenty pounds occasionally and ten pounds frequently, with no limitations on pushing or pulling, and no postural limitations. (Id.) Although Dr. Stone limited Plaintiff to standing and/or walking to three hours in an eight-hour day, Dr. Stone concluded that Plaintiff could sit for a total of six hours with no limitations on pushing or pulling. Dr. Stone further limited Plaintiff's exposure to fumes, odors, gases, dust, and poor ventilation. Thus, Dr. Stone determined that Plaintiff was capable of performing a restricted range of light work, which is consistent with the RFC assessments of Drs. Nelson and Takach.

Plaintiff's assertion that the ALJ incorrectly relied on Dr. Stone's 2004 assessment and did not consider the full record in determining Plaintiff's RFC is also without merit. As previously discussed, the ALJ did consider the medical evidence following Dr. Stone's 2004 assessment. The medical records of Drs. Price and Sweeney in 2006 and 2007 reveal that Plaintiff's respiratory problems improved with treatment. As to Plaintiff's complaints of pain in her knees, back, neck and hips, the ALJ considered the opinions of Plaintiff's treating physicians, Drs. Volpe, Puentes, and Sweeney. These treating physicians concluded in 2006 and 2007 that Plaintiff had stability and range of motions in her knees, her back pain improved with treatment, her lumbar scoliosis was mild, and had no joint pain or swelling, no weakness, and a normal gait.

Third, Plaintiff maintains that the ALJ erred in assessing Plaintiff's mental RFC because the ALJ relied on Dr. Dolente's August 2004 assessment and Plaintiff's mental condition deteriorated after 2004. However, substantial evidence supports the ALJ's finding that Plaintiff's impairments of depression and mood disorder were not disabling. In April 2005, Dr. Dolente re-evaluated Plaintiff. Although Plaintiff seemed more depressed and fatigued than in August 2004, Dr. Dolente

noted that Plaintiff was appropriately groomed and dressed, alert and oriented, and showed no signs of delusions or suicidal thoughts. Plaintiff had no problems with communications, comprehension, attention, or concentration. Despite Plaintiff's worsening depression in 2005, Plaintiff remained functional and engaged in daily living activities with the good support of her family and friends. The ALJ also relied on Dr. Weiner's April 2005 mental assessment. According to Dr. Weiner, Plaintiff's affective disorder resulted in mild restriction of daily living activities, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence, and pace and no episodes of decompensation. Thus, substantial evidence support the ALJ's determination of Plaintiff's RFC.

**D.** Plaintiff alleges that the Appeals Council should have remanded the case to the ALJ for consideration of additional evidence submitted after the ALJ's decision. Plaintiff maintains that the Appeals Council failed to properly consider the records of Dr. Wooten (Dkt. 21 at 16). Plaintiff contends that this evidence demonstrates that Plaintiff's functioning was significantly affected by her depression (Id. at 12).

"The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if 'the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1261 (11th Cir. 2007) (quoting 20 C.F.R. § 404.970(b)). Under sentence four of 42 U.S.C. § 405(g), a district court may review the Appeals Council's denial of review. Id. at 1262. "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." Id. The denial of benefits is not erroneous if it is supported by substantial evidence in the record as a whole. Id. at

1266-67.

The evidence submitted to the Appeals Council did not establish that Plaintiff was unable to perform a restricted range of light work consistent with the functional limitations prescribed by the ALJ. In April 2004, Dr. Wooten diagnosed Plaintiff with depression. Nonetheless, Dr. Wooten's records reveal that Plaintiff was alert, oriented, and cooperative. Further, Plaintiff's speech was logical, her affect appropriate, her cognitive functions were intact, and she had no memory problems. By May 2004, Plaintiff was feeling much better. In July 2004, Dr. Wooten opined that Plaintiff continued to experience symptoms of depression "on occasion," but that she responded to minimal psychotherapy and medication. According to Dr. Wooten, therapy and medication helped Plaintiff function at a higher level. Therefore, because Plaintiff has not shown a reasonable possibility that the ALJ would have reached a different decision in light of the evidence first submitted to the Appeals Council, Dr. Wooten's records are not material and the Appeals Council did not err in denying review of the ALJ's decision.

## Conclusion

The ALJ's decision is supported by substantial evidence and the proper legal principles. The decision of the Commissioner is therefore affirmed.

Accordingly and upon consideration, it is **ORDERED AND ADJUDGED** that:

(1) The decision of the Commissioner is **AFFIRMED** and the case is **DISMISSED**, with each party to bear its own costs and expenses; and

(2) The Clerk of the Court shall enter final judgment in favor of Defendant consistent with 42 U.S.C. §§ 405(g) and 1383(c)(3).

**DONE AND ORDERED** in Tampa, Florida on this 8th day of June, 2010.

ELIZABETH A JENKINS
United States Magistrate Judge